STATE of Missouri,
Plaintiff–Respondent,

v.

Floyd Randall WELSH,
Defendant–Appellant.

No. 15810.

Missouri Court of Appeals,
Southern District,
Division One.

July 31, 1989.

William L. Webster, Atty. Gen., Debra M. Miles, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

James R. Schumacher, Springfield, for defendant-appellant.

GREENE, Judge.

Floyd Randall Welsh was jury-convicted of the class C felony of tampering in the first degree. § 569.080.1(2).[1] Welsh, a prior offender with a burglary conviction, was sentenced to two years' imprisonment as punishment for the crime.

---

1. Unless otherwise indicated, all references to statutes are to RSMo 1986, V.A.M.S.

The specifics of the information charging Welsh with tampering were that Welsh, on April 26, 1987, in Dallas County, Missouri, did knowingly and without consent of the owner, operate a 1976 Chevrolet Blazer automobile.

On appeal, Welsh urges trial court error in (1) failing to declare a mistrial because of alleged juror misconduct, and (2) in permitting the State, in closing argument, to argue, over objection, an adverse inference from defendant's failure to call Larry Eidsen as a defense witness. We affirm.

Viewed in the light most favorable to uphold the jury verdict, the facts pertinent to the appeal are as follows. Ralph Phelps, a Dallas County farmer, lived approximately one-half mile from the Niangua River, a stream that was used by fishermen and floaters for recreation. Ralph owned a 1976 Chevrolet Blazer that had been given to him by his son, Doug Phelps. The Blazer, which was unlicensed, as it was only used for farm purposes, was kept in a shed near Ralph's house. Doug had visited his father on April 26, 1987, and had driven the Blazer that day. When he was finished with it, he returned it to the shed and put its keys under the seat. Later that day, after Doug had left, Ralph drove his pickup truck to the home of a neighbor, Bob Burns. As Ralph was returning home about 6:00 p.m., he met his Blazer, driven by Welsh, coming out of his driveway onto a county road. There was a canoe sticking out of the back of the Blazer, and Welsh had a passenger with him. Ralph did not know either Welsh or Eidsen, and had not given either of them permission to drive his Blazer.

Ralph went to his house and telephoned the Dallas County Sheriff to report the incident. The information regarding the incident was relayed by the sheriff's dispatcher to drivers of patrol cars in the vicinity of the Phelps home. They were told to watch for a green 1976 Chevrolet Blazer with a canoe sticking out of the back of it. At approximately 8 p.m., Laclede County Deputy Sheriff Timothy Stall, who was accompanied by Reserve Deputy Howard Triplett, was patrolling on Highway 64 in the vicinity of the J & L Campground on the Niangua River, when he spotted the Blazer and stopped it. Welsh was driving the Blazer and Eidsen was his passenger. Welsh and Eidsen were placed under arrest, and Doug Phelps was called to the scene. Welsh told Doug that he had been given permission to use the Blazer to return the canoe to the campground where Welsh had rented it. The sheriff's deputies instructed Doug to take charge of the Blazer, which he did.

Welsh and Eidsen were then charged in separate informations by the Dallas County prosecutor with the crime of car tampering. Both men were offered a plea bargain arrangement in the event of their guilty plea. Welsh rejected the plea bargain, but Eidsen, who was a close personal friend of Welsh, accepted his, and entered a plea of guilty to the charge, and was available as a witness at the time of the trial of Welsh.

At trial, Ralph Phelps, among others, testified as a State's witness. He identified Welsh as the person he had seen driving his Blazer on April 26th, and stated that he had not given Welsh permission to do so. At the close of the State's evidence, and after a short recess, the attorney for Welsh advised the trial judge that during the recess, Doug Phelps, who had been one of the State's witnesses, was seen talking to a juror, Kimberly Ford, and that even though the lawyer did not know what was said during that conversation, thought the incident justified a request for a mistrial. Doug Phelps was then called in to the courtroom, and asked to explain the incident. He said he thought he had seen Ms. Ford before and asked if she knew Buck Burton and Kevin Pierce, who were friends of Doug's, and that she replied that she knew them, that Pierce was married and that he and his wife had a new baby. He said the conversation did not last over 30 seconds, and that there was no discussion concerning the trial or any aspect of the case against Welsh. Doug was cautioned by the trial court not to have any further contact with any juror, and he promised not to do so. The trial court then denied the motion for mistrial, but stated that the attorney for Welsh could interview the ju-

ror at the end of the trial, and that "if something turns up in her testimony" the attorney could renew his mistrial motion. The attorney objected to this procedure and requested to interview the juror instanter, which request was denied.

The defendant then put on his case, which consisted solely of the testimony of Welsh. He said that he and Eidsen had rented a canoe the morning of April 26th from J & L Campground, and intended to float the river from the camp to a place called Blue Springs, which was about a four-hour trip. He said that when they got to Blue Springs, the people who were going to haul Welsh, Eidsen, and the canoe back to the campground where Welsh had left his car, had not waited for them, so they continued floating down the river. They saw a big house in a field located about 1/4 mile from the stream. He said they walked up to the house and that about that time Ralph Phelps arrived in his pickup. Welsh said he explained his plight to Phelps, which was if he did not get the canoe back to the campground that evening he would have to pay an extra day's rental. Welsh said that Phelps told him to take his Blazer to return the canoe. He said that Eidsen, who was his close friend, was present during this conversation and, although he didn't know if Eidsen heard what Phelps had told him, could testify that they had met Phelps and that Welsh had talked to him. Phelps denied any such meeting or conversation. Welsh also testified that when he got the Blazer out of the shed, the keys were in the ignition. He stated that Doug Phelps was lying when he said he had put the car keys under the seat, and that Ralph Phelps was lying when he testified he had not given Welsh permission to take the Blazer.

At the conclusion of the defendant's evidence, his lawyer filed a motion in limine to prevent the prosecutor from arguing an adverse inference by reason of the failure of Welsh to call Eidsen as a witness. As grounds for the motion, defense counsel stated:

And the grounds for this motion are that he is not equally available to Floyd. For one reason, Mr. Eidsen was charged with the theft, felony stealing of the same motor vehicle. I do not know the present status of those proceedings, but he was charged as a Defendant in a separate case of the theft of the same motor vehicle in the same incident as has been the subject of this case.

Also, that there's—There's not been sufficient proof that Mr. Eidsen is available at this time to either party; that he is—that his appearance could be produced.

The motion was denied, and the prosecutor was permitted, over the objection of the attorney for Welsh, to note that if Eidsen could substantiate Welsh's story that they had met Ralph Phelps and had had a conversation with him before they took the Blazer, why didn't Welsh call Eidsen as a witness.

After the jury returned from its deliberations with a verdict of guilty, Kimberly Ford was called as a witness, and examined by the trial judge and by defense counsel. She testified that during the recess, Doug Phelps asked her if he had seen her before, and that she had replied, "I don't think so." He also asked her if she knew Kevin Pierce and Buck Burton, and after she said yes, asked her how they were doing, and she said, "They're fine—They had a baby." That was all there was to the conversation, and it had lasted approximately eight seconds. She said she had never seen Doug Phelps before the conversation.

■ In his first point relied on, Welsh contends the trial court improperly put the burden on him to prove that Juror Ford was not improperly influenced by the conversation with Doug Phelps. While it is true that the law of the State of Missouri is that when a juror engages in a conversation with a State's witness during trial, it is the State's burden to prove that the juror was not improperly influenced by such exchange, *State v. Martin*, 624 S.W.2d 879, 882 (Mo.App.1981), we hold that such burden was met here. There is nothing here to show that the brief conversation between Ford and Phelps influenced her vote of guilty in any way, or that she had com-

municated anything concerning such conversation to any other juror. The conversational exchange, though improper, was casual, brief, and totally unrelated to anything connected with the trial of Welsh. Under those circumstances, we fail to see how the conversation prejudiced Welsh in any way. *State v. Martin*, 624 S.W.2d at 882. *See also State v. Baum*, 714 S.W.2d 804, 811 (Mo.App.1986) and *State v. Pospeshil*, 674 S.W.2d 628, 634 (Mo.App.1984) for examples of where similar juror misconduct was held to be not prejudicial.

█ The granting of a mistrial is a drastic remedy that should not be granted unless it is evident that the error committed at trial is so prejudicial that no other remedy but mistrial will suffice. *State v. Smith*, 675 S.W.2d 690, 694 (Mo.App.1984). No such showing of prejudice occurred here. The trial court did not abuse its discretion by denying the motion for mistrial.

In his remaining point relied on, the attorney for Welsh argues that Larry Eidsen was equally available to the State and to Welsh to be called as a witness and, therefore, the trial court erred when it permitted the prosecutor to argue an adverse inference from the defendant's failure to call Eidsen as a witness. He contends that not only was Eidsen equally available as a witness for the State, he was more available, since he had already entered a plea of guilty to improper use of the Blazer before the Welsh trial and, therefore, if called by Welsh as a witness, the jury would learn of the guilty plea which would prejudice them against Welsh because of his past association with Eidsen.

█ The trial court has considerable discretion in allowing or rejecting argument of counsel, and its rulings will not be reversed for an abuse of discretion unless the argument in question is clearly unwarranted. *State v. Clark*, 711 S.W.2d 928, 932 (Mo.App.1986). Here there was no such abuse of discretion. While it is true that a party cannot comment on the failure of the other party to call a witness equally available to both, *State v. Valentine*, 587 S.W.2d 859, 864 (Mo.banc 1979), the term "equally available," means more than susceptibility to process. The question of whether a witness is equally available is resolved by considering three factors, which are (1) the one party's superior ability to know or identify the witness, (2) the nature of the testimony the witness may be expected to give, and (3) the relationship between the particular party and the witness which indicates the witness would be more likely to testify more favorably for one party than another. *State v. Clark*, 711 S.W.2d 928, 932–933 (Mo.App.1986).

█ Eidsen and Welsh were friends, and Welsh had superior knowledge on how to locate him and obtain his presence at trial. In fact, Welsh testified at his sentencing hearing that he had called Eidsen at his place of employment and arranged for Eidsen to leave work so that he could come to court and testify as a witness for Welsh, and that Eidsen came to the courthouse, but arrived too late to be used as a witness.

During the trial, and during the cross-examination of Welsh by the prosecutor, this exchange occurred:

Q. All right. Now, Larry Eidsen was with you; wasn't he?

A. Yes, sir, he was.

Q. And was he with you—He—you said he was a good friend of yours?

A. Yes, sir.

Q. And he was with you during all this?

A. Yes, sir, he was.

Q. Now, did he—Did he hear Mr. Phelps tell you to take that truck?

A. Mr. Eidsen—Whenever I stopped the vehicle to talk to Mr. Phelps, Mr. Eidsen got out and walked around to the front of the Blazer, and I walked to the side of the Ford pickup. I don't know if Mr. Eidsen could hear any part of the conversation that me and Mr. Phelps had or not.

Q. So, he couldn't come in here today and tell this jury that Mr. Phelps was around there; could he?

A. The only thing that Mr. Eidsen could do is state that I did stop the vehicle and talk to the man. As far as him hearing if we had any type of a conversation, I can't say.

Q. So, Mr.—Your good friend, Mr. Eidsen, could tell this jury that Mr. Phelps was out there and talked to you; couldn't he?

A. Yes, sir, he sure could.

If Welsh were telling the truth about meeting Ralph Phelps on the road, at which time Phelps gave Welsh permission to use the Blazer to take the canoe back, that Welsh's good friend Eidsen, whom Welsh had asked to be a witness, could have, at least, corroborated meeting and stopping to talk with Phelps on the road. We believe that from this evidence the trial court could reasonably have believed that a community of interest existed between Welsh and Eidsen, and for that reason, Eidsen could be expected to testify favorably in Welsh's behalf and, at least, corroborate part of his story. *See State v. Reid,* 712 S.W.2d 74, 75 (Mo.App.1986) for a similar fact situation.

Considering all the facts and circumstances, we hold that the trial court did not abuse its discretion by permitting the prosecutor to argue an adverse inference from the failure of Welsh to call Eidsen as a witness to corroborate his story.

The judgment of the trial court is affirmed.

HOLSTEIN, C.J., and CROW, P.J., concur.